IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AL MAKAASEB GENERAL
TRADING CO.,

      Plaintiff,                           05cv0758

      v.                                **ELECTRONICALLY FILED**

UNITED STATES STEEL
INTERNATIONAL, INC., ET AL.,

      Defendants.

**December 30, 2005**

**<u>Memorandum Opinion</u>**

**I. Introduction**

This case arises from a failed business deal between plaintiff, Al Makaaseb General

Trading Co. (AMGT) and Vijaya Gajapathy Engineers PVT Ltd. (VG) for the shipment of 756

metric tons of seamless steel pipes to a client with whom VG had previously contracted in Doha,

Qatar.  VG forged a contract of sale with United States Steel International, Inc. (USSI) for the

purchase and transport of the steel pipes to be delivered to the dock at the Port of Mobile,

Alabama.  VG also contracted with Rulewave, Inc. (Rulewave), who was the designated freight

forwarder of this material from the Port of Mobile to Doha, Qatar and other points abroad.

However, on the eve of delivery of the these pipes to the dock at the Port of Mobile, Alabama,

VG discovered that it was unable to obtain a letter of credit (L/C).[1]  VG then made a deal with

---

[1] Letters of credits have been commonly used in commercial transactions for centuries. A letter of credit is essentially a promise by the "issuer" (a bank or other person issuing credit) to the "beneficiary" (a person who is entitled under its terms to draw or demand payment) to extend credit on behalf of the beneficiary's customer (a buyer of goods or other person who causes an issuer to issue credit).  *Toyota Indus. Trucks U. S. A., Inc. v. Citizens Toyota Indus. Trucks U. S. A., Inc.*, 611 F.2d 465, 469 (3d Cir. 1979).  Letters of credit require no consideration but are nonetheless binding obligations.  *Id.*

plaintiff for plaintiff to act as the financier on the L/C. Although plaintiff's name was listed on the L/C, VG still maintained the prior contracts with USSI and Rulewave. At some point during the process, plaintiff became dissatisfied that it did not have ultimate control over the contracts VG had forged with USSI and Rulewave. Rather than seeking redress against VG, plaintiff brought the instant action against USSI and Rulewave.

Plaintiff alleges that it is entitled to summary judgment because defendant USSI: (1) breached its warranties of presentation under Section 5109 of the Pennsylvania Uniform Commercial Code when it presented false and fraudulent documents to obtain payment on plaintiff's L/C; (2) breached its contract of sale for certain steel pipes by failing to deliver the pipes to the Mobile, Alabama Port Authority, as bailee for plaintiff; (3) defrauded plaintiff when, with the intent to deceive both the issuer of plaintiff's L/C and plaintiff, presented and delivered to plaintiff documents that falsely represented USSI had delivered the pipes to the Mobile Port Authority, when in fact they had not; and (4) breached its implied contract as bailee for the steel pipes when it negligently failed to exercise due care to prevent unauthorized removal of the steel pipes from the Port of Mobile. Plaintiff also argues that it is entitled to summary judgment as to defendant Rulewave for: (1) negligence *per se*, as a result of Rulewave's violations of its duties as a licensed freight forwarder subject to the regulations of the United States Federal Maritime Commission; and (2) conversion, as a result of the Rulewave's intentional interference with AMGT's property rights in the steel pipes by "lifting them" from the port of Mobile and exporting them to Holland, Qatar, and the United Arab Emirates, and, conversion, as a result of Rulewave's refusal to surrender the pipes to AMGT.

For the reasons that follow, this Court finds that there was no contract of sale between

plaintiff and USSI, that USSI and Rulewave did not breach the terms of the contracts they formed with VG, and that the L/C did not alter the terms of the contractual relationship that was formed between VG and USSI, and VG and Rulewave.  After careful consideration, this Court will deny plaintiff's motions for summary judgment against USSI (doc. no. 18) and Rulewave (doc. no. 19).

## II.  Factual Background

### A.  Joint Undisputed Material Facts Submitted by the Parties

1.    AMGT is a company headquartered in the United Arab Emirates (UAE).

2.    USSI is a wholly-owned subsidiary of United States Steel Corporation with offices in Pittsburgh, Pennsylvania.

3.    Rulewave is a freight forwarder licensed by the U.S. Federal Maritime Commission and has an office in Houston, Texas.

4.    Vijaya Gajapathy Engineers Pvt. Ltd. ("VG") was an Indian company.

5.    Shoukat Ali Sandila is the director of AMGT.

6.    Hartmut Stuhldreier is the president of Rulewave in Houston, Texas.

7.    In July 2003, VG contacted Rulewave regarding the rates for shipment of steel pipes.

8.    In August of 2003, VG issued a Purchase Order and an Amended Purchase Order to USSI for the purchase of approximately 756 metric tons of seamless steel pipes for delivery to the Port of Mobile.

9.    VG's Purchase Order stated it would pay for the steel pipes by way of an irrevocable L/C, payable at sight.

10.     On September 2, 2003, USSI issued a proforma invoice to VG for the steel pipes.

11.     VG was unable to open an L/C in its own name to pay for the steel pipes.

12.     In October 2003, VG approached AMGT to open an L/C to pay for the 756 metric tons of seamless steel pipes.

13.     On November 14, 2003, USSI was advised that a letter of credit would be opened to pay for the steel pipes.

14.     On December 30, 2003, an L/C in the amount of $656,756 payable to USSI was issued by Mashreqbank in UAE upon the application of AMGT (the "L/C").  Some of the terms of that L/C were not acceptable to USSI.

15.     On January 13, 2004, USSI notified VG that USSI was "canceling" VG's order and diverting the pipe at Mobile to other customers, because "you have not been able to provide us with an adequate L/C in order to ensure a timely shipment of your order."

16.     On January 14 and 15, 2004, there were communications about the steel pipes.[2]

17.     On January 20, 2004, the L/C was amended.

18.     USSI caused 20-inch and 24-inch seamless pipe to be transported by rail to the Port of Mobile, Alabama.

19.     The Steel Pipes were unloaded from railcars at the Port of Mobile.

20.     On February 23, 2004, as supplemented on February 25, 2004, USSI submitted documents to Mellon Bank to draw on the L/C for partial payment on the steel pipes.

21.     On March 5, 2004, as supplemented on March 9, 2004, USSI submitted documents to Mellon Bank to draw on the L/C for the balance of payment on the steel pipes.

_____

[2]See below disputed material facts.

22.     In mid-April 2004, in correspondence to USSI and copied to Rulewave, AMGT requested that the steel pipes not be delivered to anyone without the proper instruction of AMGT.

23.     Subsequent to the correspondence from AMGT, Rulewave had communications with VG in which VG asserted its ownership of the steel pipes.

24.     On May 1, 2004, Premier Stevedore ("Premier") began stuffing the steel pipes into containers at the direction of Rulewave upon the instructions of VG.

25.     In May 2004, USSI's shipping agent at the Port of Mobile, NSA Agencies, Inc., had discussions about the turn-over of the steel pipes.

26.     By the end of May 2004, all of the steel pipes had been removed from the Port of Mobile after being loaded by Premier at the direction of Rulewave, pursuant to the instructions of VG.

27.     The steel pipes were shipped to Rotterdam, Holland, Doha, Qatar, and Dubai, UAE pursuant to instructions given to Rulewave by VG.

28.     AMGT never gave instructions for the removal of the steel pipes from Mobile or their shipment out of the United States.

## B.  Disputed Material Facts

The following is a brief statement of disputed material facts.[3]

1.  As noted above, the parties agree that on January 15, 2004, there were "communications" between the parties about the steel pipes.  However, the nature and substance of those "communications" is in dispute.

---

[3]The parties submitted approximately 300 pages of disputed facts.  However, the Court will address only the most relevant and material disputed facts in a condensed format.

2.  Plaintiff alleges that "on January 15, 2004, AMGT and USSI discussed and reached agreement on the terms of an amended L/C, and based on such agreement, USSI agreed to replace the steel pipes removed from the Mobile Port."

3.  USSI, however, disputes that contention and states that, to the contrary, on January 14, 2005, representatives of USSI and representatives of VG discussed VG's continued interest in obtaining the pipes from USSI and uses the January 14, 2004 letter from USSI to VG, as evidence of that agreement: "We will consider reinstating your [VG's] order with a copy of the bank swift message indicating that amendments have been issued to the Letter of Credit No. I065537. . . . In the event you wish us to reinstate your order, please comply with each and every one of the conditions listed above. . . ."  On the next day, January 15, 2004, VG responded by fax, requesting that VG have until January 20 to effectuate the required amendments due to banking holidays in the UAE.

4.  According to plaintiff, the "agreement" between AMGT and USSI is described in a January 15, 2004 email message between Tom Burr (who was the supervisor of USSI's customer service) to VG *and* AMGT.  That email message, which was actually sent from Burr to VG, with carbon copy to AMGT, stated: "I have also been in conversation with Mr. Ali Sandila of Al-Makaaseb General Trading.  He has confirmed acceptance of the three conditions required to reinstate **your** order." Plaintiff's Exhibit 12. (Emphasis added).

5.  USSI states that the hereinabove email message evidences that no "agreement" was reached between AMGT and USSI - to the contrary, the "agreement" was reached between USSI and VG to "reinstate your [VG's] order."

6.  Essentially, while plaintiff claims that the amended L/C and a conversation on January

15, 2004 created a new contract of sale between plaintiff and USSI, defendants claim that they

complied with the terms of the only contracts they had - (1) the contract for shipment of the steel

pipes to the Port of Mobile, Alabama, between VG and USSI, and (2) the contract for shipment

of the steel pipes from Mobile to points abroad, between VG and freight forwarder, Rulewave.

7.  Nonetheless, according to plaintiff, the L/C (as amended) required that a dock receipt

be issued by the "Mobile Port Authority, Alabama," confirming that the relative goods were

delivered to them for loading on board the vessel nominated by M/S Al Makaaseb General

Trading Co. LLC, and that the L/C called for delivery of the steel pipes FOB.

8.  USSI disputes the statement that the basis of sale was FOB, and states that all of the

documents (including the purchase orders, order acknowledgements, and the proforma invoice),

correspondence and discussions (including testimony of AMGT's Mr. Sandila, who testified,

"we bought the pipes at FAS or delivered to docks at Mobile Port") between the parties

confirmed that the basis of sale was FAS Port of Mobile.

9.  According to plaintiff, the L/C provided that it would expire (without payment) if

"shipment" of the steel pipes was not completed, as evidenced by such dock receipts, on or

before February 29, 2004.

10.  Again, USSI disputes that, by way of Amendment No. 2, that the latest date of

shipment was February 29, 2004; that the new date of expiry was March 21, 2004, and that the

shipment and negotiation dates were extended to February 29, 2004 and March 21, 2004,

respectively.

11.  Plaintiff claims that Peg Babnik, who is a Distribution Manager of Logistics for

USSI, wrongfully prepared the dock receipts and instructed the Port to date the receipts to show

7

that the steel pipes were unloaded on February 28, 2004, when they had not been completely

unloaded until March 3, 2004.

12.  USSI disputes that contention and states that all of the pipe had arrived at the Port of

Mobile on or before February 28, 2004, and that of the 510 pieces of pipe that were the subject of

VG's order, only 32 pieces had not been unloaded prior to March 3, 2004.  USSI further states

that the dock receipt dated February 28, 2004 was not signed by Tri-State Maritime Services,

until all of the pipe had been unloaded and placed at rest on the dock and that it is the custom and

practice of the Port to date the dock receipt at the point when the cargo is on the ground at point

of rest in good condition and according to the expected date that the cars would be unloaded, but

that the date shown on the dock receipt is not always accurate because "sometimes things

change."

13.  According to plaintiff, on March 10, 2004 AMGT wrote the following fax to USSI

and Rulewave: "we have decided not to ship the relative pipes to Doha (Qatar) . . . Therefore,

you are kindly requested to hold the material at the docks until we issue you new instructions for

delivery and destination."  Plaintiff's Exhibit 23.  In its statement of facts, plaintiff stated,

however, "this fax appears to have been misdirected."  Statement of Facts,  ¶ 79.

14.  Defendants do not dispute that plaintiff drafted the March 10, 2004 fax, but state that

they did not receive any such letter from plaintiff, rather that said fax was sent to numbers that do

not belong to either defendant Rulewave or defendant USSI.

15.  According to plaintiff, on March 17, 2004, it terminated its "business relationship"

with VG.

16.  Defendants do not dispute that AMGT sent a letter to VG on March 17, 2004, but

they claim that neither of them were copied on such letter, nor were they advised of its contents. Further, defendant Rulewave, states that plaintiff has "mischaracterized" the letter because said letter did not terminate plaintiff's business relationship with VG, but rather, it stated that plaintiff would not supply the steel pipe to VG's customer.

17.   Plaintiff claims that on April 13, 2004 in a fax to USSI, with a copy to Rulewave, plaintiff wrote: "You are hereby requested to instruct the Mobile Port Authority to not to deliver or ship the good without proper written instructions from Al Makaaseb General Trading Co., Dubai, UAE, duly signed by its Director Mr. Shoukat Ali Sandila and legalized by the Dubai Chamber of Commerce and Industry," but that defendant Rulewave made no effort to contact Mr. Sandila of AMGT or USSI about the letter.

18.   Defendants agree that they received the April 13, 2004 fax but Rulewave disputes that it failed to take any action in response to that letter.  Rulewave states that it did take action in response to the April 13, 2004 letter - by contacting Mr. Naidu of VG who was in "constant contact" with Mr. Sandila of AMGT.

19.   According to plaintiff, Rulewave knew that plaintiff was the party that obtained the L/C and that plaintiff (not VG) selected Rulewave as its freight forwarder.

20.   Defendant USSI agrees that it knew plaintiff had obtained the L/C, however, it disputes that plaintiff selected Rulewave as its freight forwarder.  USSI states that Rulewave was selected by VG and cite a December 29, 2003, letter from VG to plaintiff, where VG advised, "we have arranged with the following shipping company - Rulewave, Inc."  USSI Exhibit 23. Further, defendant Rulewave contends that it never saw the L/C obtained by plaintiff.

21.   Plaintiff contends that it sent another email on April 14, 2005 to USSI advising them

9

not to release the pipes, to which defendant USSI responds that Mr. Perdue, of USSI stated that "USSI recognizes your party as the owner of the referenced pipes," and suggested that he contact Mr. Naidu with VG as they are the party that is in contact with Rulewave.  Plaintiff's Exhibit 29., USSI Exhibit 49.  According to USSI, Mr. Perdue later testified that when he referenced "your party," he was not distinquishing plaintiff from its "associate company," VG.  USSI Exhibit 51. Statement of Facts, ¶ 89.

22.  A series of emails between and among the parties commencing on April 13, 2004 and continuing through June, 2004, evidences that plaintiff continued to claim that the pipes belonged to it and should not be shipped without its approval.  However, defendants continued to treat VG as the owner of the pipes and the contracting party.

23.  Plaintiff contends that Rulewave changed the Bills of Lading for the steel pipes shipped to Dubai, UAE, and Doha, Qatar, because Rulewave "wanted to get paid for the freight money."

24.  Defendant Rulewave disputes that contention and states that the Bills of Lading were ultimately changed to reflect plaintiff as the shipper of the steel pipes at the insistence of plaintiff and as a result of plaintiff's threats of legal action.

### III.  Standard of Review

Summary judgment under Fed.R.Civ.P. 56(c) is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Woodside v. School Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001), *quoting Foehl v. United States*, 238 F.3d 474, 477 (3d

Cir.2001) (citations omitted).  In deciding a summary judgment motion, the court must "view the evidence ... through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Thus the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (*citing Celotex*, 477 U.S. at 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994).

11

"In considering a motion for summary judgment, a district court may not make credibility

determinations or engage in any weighing of the evidence; instead, the non-moving party's

evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)." *Marino v. Industrial Crating Co.*, 358 F.3d

241, 247 (3d Cir. 2004.)  *See also Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001)

(court must view facts in the light most favorable, draw all reasonable inferences, and resolve all

doubts, in favor of the nonmoving party ).

## IV.  Discussion

### a.  Breach of Warranties of Presentment in Violation of 13 Pa.C.S. § § 5110, 5111 (against USSI):

Plaintiff alleges that USSI breached UCC Sections 5-110 and 5-111 (13 Pa.C.S.A. § §

5110-5111) by presenting a "forged"[4] or "materially fraudulent" document in the form of a dock

receipt when it drew upon the L/C.

In *Leonard A. Feinberg, Inc. v. Central Asia Capital Corp., Ltd.*, 974 F. Supp. 822

(E.D.Pa. 1997), the Court addressed the L/C in the context of UCC Section 5, which this Court

finds instructive:

> The most salient feature of a letter of credit is "its independence from
> both the customer-issuer transaction and the underlying contract between the
> customer and the beneficiary."  The "independence principle" dictates that the
> letter of credit is a "commercial instrument completely separate from the
> underlying contract between the customer and beneficiary. The independence
> principle obliges the issuer to honor the draft when the beneficiary presents
> conforming documents without reference to compliance with the terms of the
> underlying contract between the customer and the beneficiary."

---

[4]The use of an unauthorized signature on an instrument capable of producing prejudice
with fraudulent intent would constitute the crime of forgery.  *Commonwealth v. DiPiero*, 208
A.2d 912 (Pa. Super. Ct. 1965).

"Independence" essentially dictates that "[t]he issuer must honor conforming documents regardless of the terms that may, or may not, govern the underlying contract. A beneficiary who produces proper documents may draw on the letter even if he has not done the performance described by them."  In the event that a disagreement arises between the customer and the beneficiary, "the dispute is resolved with the money already in the pocket of the beneficiary. [Furthermore,] when an issuer makes payment under a letter of credit, the issuer is satisfying its own primary obligation to the beneficiary, without reference to the rights of its customer under the underlying contract with the beneficiary."

*Id.* at 829-830. (Citations omitted).

Section 5110 states that "if its presentation is honored, the beneficiary warrants to the issuer . . . and the applicant that there is no fraud or forgery of the kind described in Section 5109(a)".  Section 5109a states that:

If a presentation is made that appears on its face strictly to comply with the terms and conditions of the letter of credit, but a required document is forged or materially fraudulent, or honor of the presentation would facilitate a material fraud by the beneficiary on the issue,
(1) the issuer shall honor the presentation if honor is demanded by:
(i) a nominated person who has given value in good faith and without notice or forgery or material fraud;
(ii) a confirmer who has honored the confirmation in good faith;
(iii) a holder in due course of a draft drawn under the letter of credit taken after acceptance by the issuer or nominated person.

Section 5111, states that "unless otherwise agreed the beneficiary, by transferring or presenting a documentary draft or demand for payment warrants to all interested that the necessary conditions of credit have been complied with."

The above language, referring to beneficiary compliance with the "conditions of the credit," denotes the beneficiary's compliance with the conditions of the letter for which credit is specified in that document, not compliance with the conditions of the underlying contract. *PNC Bank, National Ass'n v. Liberty Mut. Ins. Co.*, 912 F.Supp. 169 (W.D. Pa. 1996), *affirmed*, 101

F.3d 691 (3d Cir. 1996).  And, as the Court stated in *PNC Bank,* in the absence of language expressly making veracity a condition of the credit, as long as the beneficiary presents to the issuer documents which conform with the conditions of the L/C, the warranty of presentment under Section 5111 is not breached.  *Id.* at 174.

Here, plaintiff claims that the L/C required that the dock receipt be issued by the "Mobile Port Authority."  The facts evidence that since at least 1987, the "Mobile Port Authority" has not issued dock receipts because it no longer participates in cargo handling operations and the operations directors at the Port Authority testified that it is the common practice in the industry and in accordance with the Port Authority's regulation for independent licensed cargo handlers to sign these dock receipts.

The dock receipt at issue was signed by a duly licensed cargo handler, Tri-State, and the original of the dock receipt was supplied to plaintiff.  Because the dock receipts were issued in accordance with the regulations, customs, practices and procedures at the Port of Mobile, and they were signed by the appropriate cargo handler, they were not "forged," and the fact that they were not executed by the Mobile Port Authority does not make them "forged."

Plaintiff also alleges that the February 28, 2004 dock receipt was "fraudulent" because it erroneously indicated that all 184 pieces of pipe had been unloaded at the designated pier on or before Saturday, February 28, 2004, when in fact, 32 pieces of pipe contained in two railroad cars which were physically at the Port, but which were not actually physically unloaded by the stevedore until March 3, 2004.  Although the dock receipt was dated February 28, 2004, the Tri-State representative did not sign the receipt until March 3, 2004, when all of 32 remaining pieces had been unloaded.  This trivial discrepancy falls far short of fraud.

14

What plaintiff does not demonstrate, even under the broadest reading of the above facts, is how these events could "so vitiate the underlying transaction" as to constitute a material fraud. *See Intraworld Industries, Inc. v. Girard Trust Bank*, 336 A.2d 316, 324-325 (Pa. 1975).

The Official Comments to Sections 5109 and 5110 of the U.C.C. explain that "material fraud" would not include petty or inconsequential discrepancies, that the courts must examine the underlying transaction when there is an allegation of material fraud, and that material fraud by the beneficiary occurs only when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor. *2B Uniform Commercial Code (U.L.A.) § 5-109 (Master Edition).* Even accepting *plaintiff's* position that the facts of a discrepancy is not disputed, the Court does not see how this discrepancy amounts to a fraud at all, much less a "material fraud."

As discussed above, plaintiff alleges that the dock receipts contained untruthful representations. The dock receipt is the presentation document submitted pursuant to a L/C presentment, and accordingly, even if the minor delay in unloading could be construed to render the receipt false, the warranty of presentment was not breached because veracity was not a condition of the letter of credit. *PNC Bank, National Ass'n,* 912 F. Supp. 169; *Farmers-Merchants Bank & Trust Co. v. Travelers Indemnity Co.*, 791 F.Supp. 150, 153 (W.D. La 1992). Accordingly, accepting plaintiff's position that there is no dispute of material fact on this issue, defendant USSI is not liable for breach of the warranty of presentment as a matter of law.

**b.  Breach of Contract (against USSI):**

Plantiff claims that on January 15, 2004, it and USSI amended the L/C and created a new

15

oral contract of sale[5] for the steel pipes.  Plaintiff alleges that the contract between USSI and

itself grew from a "failed deal" between USSI and VG because VG was to unable obtain a letter

of credit.  Plaintiff claims that USSI breached this "new" contract of sale by (i) failing to deliver

the pipe to the Mobile Port Authority as bailee for AMGT and (ii) to complete delivery on an

F.O.B.[6] basis.

      According to defendants, however, plaintiff and USSI never had a contract for sale, but

rather, plaintiff was the financier and an associate company of VG, with whom USSI had a

contract for sale.  After reviewing the documentary evidence of record, there is no evidence to

support plaintiff's assertion that a new contract was created on January 15, 2004.  Instead, the

record evidence reveals the following: First, by correspondence dated November 14, 2003, VG

advised USSI that the "the l/c on U.S. Steel will be opened on our behalf from our associate

company in Dubai whose details are as indicated below –Al Makaaseb General Trading Co."

USSI Exhibit 17.  Second, and perhaps even more telling, is the email message offered by

*plaintiff*, between Tom Burr of USSI and G. Naidu of VG, where USSI explained "I have also

been in conversation with Mr. Ali Sandila of Al-Makaaseb General Trading.  He has confirmed

acceptance of the three conditions [related to the l/c] required to **reinstate your order**."

Plaintiff's Ex. 12. (Emphasis added).

      The factual record indicates that the parties all believed USSI and VG had a contract for

---

     [5]A contract for sale is "either a present sale of goods" (where title passes by making a contract) or a "contract to sell goods at a future time." Section 2106.

     [6]F.O.B. means "free on board" at a named place and F.A.S. means "free alongside" at a named port.  The basis of sale determines when the risk of loss passes from seller to buyer. Section 2319.

sale which was being "reinstated" based on the fact that plaintiff was the new source of financing for VG.  There is simply no evidence to support plaintiff's assertion that the financial arrangement between VG and plaintiff created a sales contract between plaintiff and USSI or that the previous sales contract between VG and USSI was nullified and that plaintiff and USSI forged a new agreement.  The agreement for the sale of the pipes was entered into between VG and USSI, as evidenced in a letter of intent, VG's purchase order, and USSI formal acceptance of that order, and the correspondence of January 15, 2004, the date plaintiff alleges a new contract was formed, confirms only USSI's agreement to "reinstate" VG's order.  Plaintiff's contractual relationship was with VG, not USSI, and it is to VG that plaintiff must seek any recourse.

Even assuming for sake of argument that plaintiff was an additional, new party to the contract between VG and USSI, USSI still performed under the terms of the contract between USSI and VG because USSI delivered the steel pipes in conformance with the terms of that contract.  All of the documentary evidence shows that the basis of sale was not F.O.B., as plaintiff claims, but was "F.A.S.[7] Port of Mobile," as was evidenced in the purchase order, the "proforma invoice" issued to VG (which was referenced in the L/C) and even in a letter VG wrote to plaintiff describing the basis of sale with USSI ("please note that the basis of delivery for U.S. Steel is 'FAS Mobile Alabama Port basis.'") USSI, Exhibit 20.  USSI fully complied with proper tender delivery on a F.A.S. basis, and there is no support for plaintiff's claim that its

---

[7]Section 2319(b)(1) provides that "to properly tender delivery on an F.A.S. basis, a party must: (1) at his own expense and risk deliver the goods alongside the vessel in the manner usual at that port or on a dock designated and provided by the buyer; and (2) obtain and tender a receipt for the goods in exchange for which the carrier is under a duty to issue a bill of lading."  A "Bill of lading" is a document evidencing the receipt of goods for shipment issued by a person engaged in the business of transporting or forwarding goods, and includes an airbill.

alleged undocumented "contract" with USSI required anything other than F.A.S. delivery. Therefore, again, defendant USSI is not liable for breach of contract as a matter of law, because there was no contract between the parties, and even if there was, USSI did not breach said contract.

### c. Negligent/intentional misrepresentation and/or fraud (against USSI):

Plaintiff again claims that the documents used by USSI to obtain payment on the L/C were "material representations intended to mislead [both] the banks" negotiating the L/C and plaintiff and that such misrepresentation constitute common law fraud under Pennsylvania law. Defendant USSI counters that plaintiff recasts the same allegations that it used to support its failed breach of warranty claim under the UCC.

In order to demonstrate common law fraud, plaintiff must establish: "(1) a representation; (2) that is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance." *Porreco v. Porreco*, 811 A.2d 566, 570 (Pa. 2002).

However, even accepting plaintiff's position that there is no dispute of fact about the misrepresentation, there is no evidence to support its assertion that any alleged representation was material to the transaction at hand, was made falsely and with knowledge or even recklessness of its truth or falsity, was made with the intent of misleading plaintiff, or that there was any harm caused by the effect of an inconsequential delay in unloading the last 6% of the remaining pipes.

In support of its common law fraud theory, plaintiff cites *Holmberg v. Morrisett*, 800

18

F.2d 205 (8th Cir. 1986).  In that case, the beneficiary of the L/C had only actually shipped

$65,232 worth of goods but drew $193,964 on the L/C, and had altered and concealed the

documents to hide the wide discrepancy.  That factual scenario illustrated an elaborate scheme to

falsify documents to draw upon a L/C, whereas here, at most, we have a petty or trivial

discrepancy that never amounted to anything close to a "material" misrepresentation, or a fraud.

Accordingly, plaintiff's claim for common law fraud fails as a matter of law.

### d. Implied contract for bailment (against USSI)

In its motion for summary judgment, plaintiff alleges a new theory of liability, that due to

USSI's alleged failure to deliver the steel pipes to an independent bailee, USSI somehow became

bailee to plaintiff and therefore, breached a duty to exercise "due diligence."[8]  Plaintiff claims

that "when USSI accepted its payment of $656,756, it committed to assure plaintiff's contractual

right to determine disposition of the steel pipes at the port."

A bailment is a "contract, such as arises where one delivers property to another to keep

for hire either express or implied."  *Manchester Equipment Company, Inc. v. American Way*

*Moving & Storage Co.*, 176 F.Supp.2d 239, 245 (D. Del. 2001).  As the Pennsylvania Superior

Court stated in *Lear, Inc. v. Eddy,* 749 A.2d 971 (Pa. Super. Ct. 2000), a contract for bailment -

express or implied - must be based on the agreement or the conduct of the parties.  A contract for

bailment may be implied where "the natural and just interpretation of the acts of the parties

---

[8]As defendant points out, plaintiff's complaint mentions no such theory of an implied bailment or any breach thereof.  However, because Fed.R.Civ.P. 8(a) requires a complaint must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests, and because plaintiff pled a breach of contract theory, defendant was on notice of this claim.  Further, USSI did not identify any alleged prejudice as a result of plaintiff's failure to plead this new theory, and therefore, this Court will consider plaintiff's argument on its merits.

warrants such a conclusion." *Id.* at 973 (quoting *Riggs v. Com., Dept. of Transp.,* 463 A.2d

1219, 1220-21 (Pa. Cmwlth. 1983)).  However, in *Lear, Inc.*, the Court found an implied

bailment when a party who was originally to transport goods, also agreed to store them.  Unlike

the situation in *Lear, Inc.*, USSI was charged with delivering the goods to the dock, in

compliance with the terms of the contract of sale between USSI and VG.  There is no evidence to

support plaintiff's claim that USSI either expressly or implied agreed, suggested, or conducted

themselves in a manner that would create a contract for bailment.

Even assuming for the sake of argument that an "implied bailment" could be established,

under Pennsylvania law, if a bailment is found to exist for the benefit of *both* parties, "the law

requires ordinary diligence on the part of the bailee, and makes him responsible for ordinary

neglect." *Ferrick Excavating and Grading Co. v. Senger Trucking Co.*, 484 A.2d 744, 747-748

(Pa. 1984).  However, where, as here, a bailment is for the sole benefit of the bailor, "the law

requires only slight diligence on the part of the bailee, and . . . makes him answerable only for

gross neglect." *Id.*  Under that standard, and accepting plaintiff's assertion that there is no

dispute of material facts, plaintiff has presented no facts which indicate anything close to gross

neglect under these circumstances.  Accordingly, plaintiff's claim for breach of an implied

contract for bailment fails as a matter of law.

### e.  Negligence *Per Se* (against Rulewave)

Plaintiff claims that the undisputed record establishes Rulewave's negligence *per se.*

However, as Rulewave points out, plaintiff did not assert in its complaint either negligence or

negligence *per se* as a potential legal theory.  Rulewave alleges that it was not on notice of a

negligence or negligence *per se* claim, nor could it reasonably have been placed on notice that a

claim of negligence or negligence *per se* was going to be advanced against it.  In the complaint, plaintiff alleges two theories of liability against Rulewave - one for conversion of chattels (Count IV) - and two for tortious interference with contract and prospective business relationships (Count V).

Under Fed.R.Civ.P. 8(a), as long as an issue is pled, the party does not have to state the exact theory of relief in order to obtain a remedy.  *Bechtel v. Robinson*, 866 F.2d 644, 649 (3d Cir. 1989).  However, the Rule 8(a) does not permit the plaintiff to wait until the last minute to ascertain and refine their legal theories, especially if the defendant will be prejudiced.  *Elliott Industries Limited Partnership v. BP American Production Company*, 407 F.3d 1091, 1122 (10th Cir. 2005).

In this case, it would be unfair and prejudicial to Rulewave to require it to answer to an entirely new theory of liability at such a late date.  Plaintiff never sought leave to file an amended complaint on or before September 15, 2005 (the date required by the Case Management Order), and discovery ended in this case on November 14, 2005. Accordingly, Rulewave was deprived of its right to take discovery on a negligence or negligence *per se* claim, a theory which is quite different from the conversion claim.[9]  Therefore, plaintiff's motion for summary judgment

---

[9]The elements necessary for proof of a conversion claim as are set forth below are distinct from a negligence or negligence *per se* claim.  Conversion, under Pennsylvania law, is the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith without the owner's consent and without legal justification. *Universal Premium v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3rd Cir.1995).  The elements of a negligence claim include: a legal duty, a breach of that duty, a causal relationship between the defendant's negligence and plaintiff's injuries, and damages.  *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998).  Under Pennsylvania law, negligence *per se* consists of four elements : (1) the purpose of the statute must be, at least in part, to protect the interest of the plaintiff individually, as opposed to the public; (2) the statute or regulation must clearly apply to the conduct of the defendant; (3) the defendant must violate the statute or regulation; and (4) the violation of the statute must

against Rulewave on a claim for negligence *per se* is denied.

**f. Conversion (against Rulewave)**

Plaintiff alleges that Rulewave interfered, without plaintiff's consent or **lawful justification**, with plaintiff's right of property in the steel pipes. *Eisenhauer v. Clock Towers Assoc.*, 582 A.2d 33, 36 (Pa .Super. Ct. 1990). (Emphasis added). Plaintiff correctly notes that it need not prove that it was the owner of the steel pipes, so long as it in possession of them or was entitled to be in possession of them at the time of the conversion. *Id.* Although plaintiff claims that it is entitled to summary judgment on this issue because Rulewave's liability "could not be clearer," the Court finds that to the extent that Rulewave interfered with plaintiff's possession of the steel pipes, that said interference was done with lawful justification because Rulewave had a contract with VG (which was "reinstated" by plaintiff's L/C) for the forwarding of the steel pipes. As such, Rulewave had the permission of the owner of the steel pipes to ship them, and therefore, cannot be held liable for conversion under the factual scenario alleged by plaintiff.

Likewise, plaintiff's claim that Rulewave converted the steel pipes when Rulewave refused to release the steel pipes at Doha and Dubai and held them for "ransom," is similarly untenable. The alleged "ransom" was nothing more than freight charges which Rulewave was legally justified in expecting either VG or plaintiff to pay. Under threats of legal action from both VG and plaintiff, Rulewave revised the Bills of Lading to identify plaintiff as the shipper and therefore, plaintiff was required to pay the freight charges that the contract required.[10]

---

proximately cause the plaintiff's injuries. *Cecile Industries, Inc. v. United States*, 793 F.2d 97, 100 (3d Cir. 1986).

[10]Because this Court has found that even accepting plaintiff's position that there is no dispute of material fact, Rulewave is not liable for conversion, the Court will not address

## V.  Conclusion

For the reasons set forth herein, plaintiff's motions for summary judgment will be denied.

Furthermore, accepting plaintiff's position that there is no dispute of material facts, defendants

USSI and Rulewave are not liable as a matter of law.  Should defendants choose to file motions

for summary judgment, the Court will enter an appropriate order requiring them to do so by

January 10, 2006 with response by plaintiff due on or before January 20, 2006.  An appropriate

order follows.

s/Arthur J. Schwab

Arthur J. Schwab

United States District Judge

cc:     All counsel of record as listed below

Gary L. Kaplan, Esquire
George Bobb, Esquire
DeForest, Koscelnik, Yokitis & Kaplan
436 Seventh Avenue
3000 Koppers Building
Pittsburgh, PA 15219

Thomas R. Wright, Esquire
United States Steel Corporation
600 Grant St., Ste. 1500
Pittsburgh, PA 15219
TRWright@uss.com

---

plaintiff's claims for direct, consequential and punitive damages under that theory of liability. However, the Court notes that plaintiff's decision not to employ an expert to address the issue of damages would seriously undercut any damages argument if a case for conversion were to be heard by a jury because the market price of carbon steel at a particular time, combined with calculations and conclusions as to the average profit margins, is certainly beyond the scope of a lay person's knowledge, and therefore, the testimony of an expert on these issues would be imperative.

Patrick Cavanaugh, Esquire
Richard Swanson, Esquire
Del Sole Cavanaugh LLC
Waterfront Building, 200 First Avenue
Pittsburgh, PA 15222